UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

GARDNER DODD,

        Defendant.
_____/

Crim. Case No. 22-20322
Hon. Thomas L. Ludington

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Gardner Dodd defrauded the Social Security Administration (SSA) out of more than $60,000 over the course of seven years. He did this while serving as the Representative Payee for the Social Security Disability Insurance Benefits of M.L., a mentally impaired adult male who worked for Dodd at his local establishment. As Representative Payee, Dodd had a legal obligation to expend the benefits solely for M.L.'s use and benefit, and to report M.L.'s work activity and income, and any changes thereto, to the SSA. Dodd was aware of those reporting requirements, but he did not report M.L.'s work activity and related earnings to the SSA as required. Instead, he abused his position of trust by intentionally concealing and failing to disclose M.L.'s work activity and earnings

1

to the SSA in order to maintain M.L.'s eligibility for disability benefits, and in turn, to maintain his receipt of those benefits as M.L.'s Representative Payee.

On June 23, 2022, Defendant Dodd was indicted on one count of Theft of Government Funds, in violation of 18 U.S.C. § 641, and one count of Social Security Benefit Fraud, in violation of 42 U.S.C. § 408(a)(4). He pleaded guilty to Count Two of the Indictment – Social Security Benefit Fraud – on May 13, 2024, pursuant to a Rule 11 Plea Agreement. He is now scheduled to appear for sentencing at 2:00 p.m. on August 29, 2024.

Consistent with the parties' Rule 11 Plea Agreement, the Government does not make a specific recommendation as to sentence length and leaves it to the Court's discretion as to whether imprisonment is an appropriate sentence. Accordingly, the purpose of this memorandum is to offer the Government's perspective on the § 3553(a) factors to aid the Court in arriving at a sentence "sufficient, but not greater than necessary."

## I.    Introduction

The United States adopts the timeline of relevant case events, the description of the charge to which Defendant Dodd has pleaded guilty, and the statement of the offense conduct detailed by the Probation Department in the Presentence Investigation Report (PSR) dated July 19, 2024.

On August 15, 2024, the defendant filed a sentencing memorandum requesting a non-custodial sentence. The Government has thoroughly considered the defendant's filing in the preparation of this sentencing memorandum.

## II. Calculation of Advisory Sentencing Guidelines

The Probation Department has calculated Defendant Dodd's sentencing guideline range to be 12 to 18 months. (PSR ¶ 72.) This matches the Government's estimate; accordingly, the Government accepts the guidelines calculated by the Probation Department as correct.

## III. The Relevant § 3553 Factors

The task of a court at sentencing is to impose a sentence upon a defendant that is, "'sufficient, but not greater than necessary to comply with the purposes,' of section 3553(a)(2)." *United States v. Wilms*, 495 F.3d 277, 281 (6th Cir. 2007) (*quoting United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006)).

### (1) Nature and Circumstances of the Offense and History and Characteristics of the Defendant

The Court must consider, in fashioning a sentence, the nature and circumstances of the offense and the history and characteristics of a defendant. 18 U.S.C. § 3553(a)(1).

Defendant Dodd comes before the Court at the age of 56. He is in good health, is happily married with three children, and has owned and operated a local

restaurant/tavern for the past 25 years. The defendant's sentencing memorandum describes him as "a respected business man and member of the community."

Nevertheless, Dodd's offense conduct in this matter not only caused a significant loss to the Social Security Administration – a government agency, but it was particularly egregious in that it also deeply affected and impacted the life an individual *person* – the victim beneficiary, M.L.

According to the evidence gathered during the investigation conducted by the Social Security Administration Office of the Inspector General (SSA-OIG), the relationship between Dodd and M.L. began sometime in the early 2000s, when M.L. started renting one of the apartments above Dodd's bar. At that time, M.L. was working at another local restaurant, and he used his earnings to pay Dodd the monthly rent. After a few years, M.L. lost his job at that restaurant. M.L. later started working for Dodd at his establishment sometime in 2009 or 2010.

Dodd applied for disability benefits on behalf of M.L. in December 2009. According to M.L., this was against his wishes. Dodd also applied and was approved to be M.L.'s Representative Payee. As Representative Payee for M.L.'s Social Security benefits, Dodd was simply required to report M.L.'s work activity and income to the SSA. But Dodd didn't report it because he knew that it would affect M.L.'s eligibility for benefits. Indeed, had Dodd complied with his reporting requirements, M.L. would have been deemed ineligible for disability

benefits based on his work for Dodd. Dodd's abuse of his position of trust as Representative Payee caused the SSA to pay Dodd over $60,000 in benefits to which M.L. was not entitled. The SSA's financial loss remains assigned to M.L.'s Social Security record pending the resolution of this case.

Dodd's conduct as Representative Payee affected M.L. both financially *and* emotionally. Dodd had directed that M.L.'s Social Security benefits be deposited into Dodd's own personal bank account, where M.L.'s benefits were comingled with Dodd's own income and other deposits. M.L. asked Dodd if he was going to receive a big check/lump sum in retroactive benefits, and Dodd told him no. In reality, Dodd received two lump sum retroactive benefit payments on behalf of M.L., totaling over $11,000.00. It is unclear whether M.L. ever benefitted from any of that money, but he certainly didn't know that he received it. M.L. also asked Dodd where his benefit money was going, and Dodd told him that it was going to pay his (M.L.'s) bills. But when M.L. was asked (by the case agent) what was paying his rent, his work at Dodd's bar or his Social Security benefits, he replied, "I really don't know. I just did what I was told."

With regard to M.L.'s rent and his bills, the evidence reflects that M.L. had no idea how much Dodd was charging him for "rent" each month. And this was rent for a substandard apartment above Dodd's bar that did not have proper bathroom or kitchen facilities, like a stove or a kitchen sink with running

5

water.  The photographic evidence of the apartment is atrocious and speaks for itself:



6

Dodd also stole M.L.'s identity and personal identifying information (PII) and used it to take out several credit cards in M.L.'s name, without M.L.'s permission.  This bothered M.L.  Dodd did not use these cards for M.L.'s benefit, but instead used them for low interest balance transfer/cash advance checks to pay the mortgage on his business, for HVAC and other equipment repairs for his business, for food service/commercial supplies, utilities, and for other personal things, like online sports gambling, sporting goods, a king bed for Dodd's home, retail store purchases, and restaurant meals.  The only indication that M.L. ever used any of those credit cards is when Dodd lent him one so that M.L. could go to a Detroit Tigers game.

Regarding M.L.'s work for Dodd at his bar: his work activity was substantial enough to render him ineligible to receive disability benefits.  Yet, Dodd never reported the work to the SSA, placed M.L. on payroll, or reported M.L.'s wages to the IRS (another way that Dodd concealed M.L.'s work activity from the SSA).  Dodd indicated that he allowed M.L. to run a tab at the bar, deducted that amount from his weekly pay, and then gave M.L. money every Sunday.  But he never gave M.L. a legitimate paycheck, and notably, there are no business records or accountings of the hours M.L. worked or the wages he was paid.  At one point during the investigation, Dodd indicated that he would have paid M.L. $10 an hour given the type of work he was doing, but that he did not actually pay M.L.

Additionally, M.L. performed many odd jobs for Dodd: cleaning his house, shoveling snow off the roof, mowing the lawn, splitting wood, etc. Dodd didn't pay M.L. for that work either. M.L. explained that anytime Dodd bought him food, clothing, or anything else, Dodd would charge the items to a credit card and then M.L. would have to pay him back. M.L. explained that the way he would pay Dodd back was by doing work; there was no monetary exchange. This might seem reasonable enough, except that M.L. stated that he never knew what he owed Dodd or what he was being paid per hour for the work that he was doing. Essentially, M.L. was in an uninformed, perpetual state of debt/servitude to Dodd.

On top of all of this, Dodd admitted in a written statement that he knowingly failed to pay M.L. for about 2-5 hours of work per week for approximately seven and a half years. Dodd admitted that he was aware that M.L. was not writing down all of the hours that M.L. actually worked at his bar and that he knowingly and routinely underpaid M.L. for that work. These lost wages are the basis for the $15,000.00 in restitution that the parties agreed upon as relevant conduct in the Rule 11 Plea Agreement.

Dodd may have initially taken action with regard to M.L. out of sympathy and with good intentions to help M.L. out of a difficult situation, as the defense asserts in its sentencing memorandum. But the reality of the evidence is that Dodd ultimately took advantage of an intellectually disabled man, who has been

8

described as having the mental capacity of a 12-year-old, while simultaneously defrauding the Social Security Administration out of more than $60,000.00. This was not a momentary lapse in judgment on Dodd's part, but rather a series of conscious and deliberate choices that he could have corrected at any time of his own volition, but he chose not to.

### (2) Seriousness of the Offense, Respect for the Law, And Just Punishment

The second factor requires the Court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. 18 U.S.C. § 3553(a)(2)(A).

The government believes that the defendant's crime – abusing one's position of trust by intentionally concealing work activity from the SSA in order to maintain the receipt of government benefits – is a very serious offense. This purpose of sentencing is often minimized in the context of financial crimes. Nonetheless, offenses such as this negatively affect the public's perception of social welfare programs; specifically, these crimes erode confidence in the Social Security Administration and its ability to safeguard taxpayer contributions.

Moreover, it is also important to understand that this is not a "victimless" crime. Theft from the government is theft from the taxpayers that fund the government. Taking money from the Social Security Administration is an affront against every hardworking individual who pays into the system in hopes that it will

still be there to support them in their retirement or the event of a disability. As the Court is likely aware, the Social Security system is in jeopardy and conduct such as that of the defendant puts the system at even greater risk of insolvency. Now more than ever, program integrity is a topic of significant concern amongst lawmakers, highlighting the need for those who defraud the government to be held accountable.

But more importantly here, the defendant's conduct toward M.L. as his Representative Payee (and otherwise) affected M.L., a vulnerable victim, financially and emotionally, in every aspect of his life. This is evident from M.L.'s victim impact statement, as well as the letter submitted by M.L.'s sister, Ellen Scott, both of which will be submitted to the court and defense counsel contemporaneously with the filing of this memorandum. Particularly, what M.L. describes is a very sad relationship of control and broken trust which left him in a state of financial uncertainty. The fact that M.L. is unable to attend the sentencing hearing because he wants to avoid the pain of facing Dodd speaks volumes.

### (3) Need to Afford Adequate Deterrence & Protect the Public

The sentence imposed must also, "afford adequate deterrence to criminal conduct and […] protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B)-(C).

The United States acknowledges that given the defendant's lack of criminal history, any sentence imposed in this case might be sufficient to discourage *him* from engaging in additional criminal conduct.

However, the sentence imposed in this case should also serve to deter *others* from defrauding the government. Many SSA beneficiaries are unable to manage their own benefits, and the SSA must therefore depend on the honesty of representative payees. Without effective deterrence, many of those representative payees may be tempted to do exactly what the defendant did here: conceal the beneficiary's work activity and income from the SSA in order to maintain the receipt of government benefits. Whatever sentence the Court imposes needs to be sufficient to dissuade the public from engaging in misconduct akin to that of the defendant and send a message that there are significant consequences for defrauding the Social Security Administration.

### (4) Effective Training and Treatment

Additionally, the sentence imposed must, "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

The defendant is a high school graduate, has taken some college courses, and has successfully run a small business for the past 25 years. He is reportedly in good physical and mental health. (*See* PSR ¶¶ 54, 56, 59-60, 69.) There is no

indication that the defendant requires any additional educational or vocational training or medical care.

### (5) Kinds of Sentences Available and Sentencing Range

The Court must also consider, "the kinds of sentences available …[and] the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the [United States Sentencing] guidelines." 18 U.S.C. §§ 3553(a)(3), 3553(a)(4)(A).

The defendant's offense is a Class D felony and calculation of the sentencing guidelines places him in Zone C of the sentencing table. Under the applicable guideline provision, the "minimum term" of the defendant's advisory guideline range (here 12 months) may be satisfied by:

(1) a sentence of imprisonment; or

(2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

U.S.S.G. § 5C1.1(d).

### (6) Restitution, Fines, and Forfeiture

Finally, a court must consider whether there is a need to impose restitution to any victim or victims of the defendant's offenses. 18 U.S.C. § 3553(a)(7).

The defendant's crime caused a financial loss to the government; thus, the United States seeks imposition of a mandatory restitution order under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, in the amount of $60,880.10 to the Social Security Administration. The government also seeks a restitution order of $15,000 to M.L., for the relevant conduct stipulated to by the parties in paragraph 9.D. of the Rule 11 Plea Agreement. The victims and the restitution amounts above have been explicitly discussed and agreed upon by the parties as reflected in paragraph 10.E. of the parties' Rule 11 Plea Agreement. In addition to ordering restitution, the government would ask the Court to adopt the special conditions suggested by the Probation Department in ¶ 99 of the PSR.

## IV. Conclusion

Having opined on the factors set forth in 18 U.S.C. § 3553(a), the government refrains from recommending a specific sentence for the defendant, and only asks that the Court impose whatever reasonable sentence it determines to be sufficient but not greater than necessary to comply with the purposes stated in 18 U.S.C. § 3553.

Notwithstanding, the government does ask the Court to require the defendant to pay the mandatory $100.00 special assessment to the Clerk of the Court, and order the defendant to pay restitution in the full amount of $60,880.10 to the Social Security Administration and $15,000.00 to M.L.

        Respectfully Submitted,

        DAWN N. ISON
        United States Attorney

        *s/Ryan A. Particka*
        RYAN A. PARTICKA
        Assistant United States Attorney
        Deputy Chief, White Collar Crime Unit

        *s/Corinne M. Lambert*
        CORINNE M. LAMBERT
        Special Assistant U.S. Attorney
        211 W. Fort Street, Suite 2001
        Detroit, Michigan 48226
        (313) 226-9129
        Corinne.Lambert@usdoj.gov

Date:  August 22, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2024, I filed the foregoing electronically via the CM/ECF system, which will send notification of such filing to counsel of record:

James C. Howarth
150 W. Second Street, Suite 250
Royal Oak, MI 48067
(248) 353-6500
james-howarth@att.net

Mark A. Rouland
150 W. Second Street, Suite 250
Royal Oak, MI 48067
(248) 353-6500
mrouland@comcast.net

Layne A. Sakwa
150 W. Second Street, Suite 250
Royal Oak, MI 48067
(248) 353-6500
Laynesakwa@gmail.com

A copy was also provided to United States Probation Officer Keith M. Stotts via email.

*s/Corinne M. Lambert*
CORINNE M. LAMBERT